**MIAMI SAND & GRAVEL, LLC,**
**Appellant–Respondent,**

v.

**John E. NANCE & Georgia G. Nance,**
**Appellees–Petitioners.**

No. 06A01–0512–CV–552.

Court of Appeals of Indiana.

June 21, 2006.

Ralph E. Sipes, Busby Austin Cooper & Farr, Anderson, IN, Attorney for Appellant.

Martin E. Risacher, Church, Church, Hittle & Antrim, Noblesville, IN, Attorney for Appellees.

## OPINION

BAKER, Judge.

Appellant-respondent Miami Sand & Gravel, LLC (Miami), appeals from the trial court's grant of summary judgment in favor of appellees-respondents John and Georgia Nance (collectively, the Nances). In particular, Miami argues that the trial court should have dismissed the Nances' petition and complaint because a substantially similar matter was pending in Madison County at the time the Nances filed the instant petition and complaint. Additionally, Miami contends that the trial court erred in concluding that Miami's failure to perform its obligations pursuant to a lease was not the result of force majeure. Concluding that the trial court herein properly exercised jurisdiction over this matter, and finding no other error, we affirm the judgment of the trial court.

### *FACTS* [1]

■ These parties have been before this court once before. The background facts, as described in our previous opinion, are as follows:

1. We remind Miami's counsel of Indiana Appellate Rule 46(A)(6), which requires that the statement of facts be in narrative form. Merely quoting at length from motions, affidavits, letters, and court documents does not suffice.

John and Georgia own land in Madison County, on which is located a gravel pit. Over the years, John and Georgia periodically had attempted to turn the pit into a profitable mining operation. In 1998, Nick and Tonia formed N & N Sand and Gravel ("N & N") for this purpose; John and Georgia loaned Nick and Tonia substantial funds to carry out the operation. However, N & N failed to earn a profit in 1999 and 2000. In 2000, Nick met Mike Pettijohn. The two agreed to form Miami, a new company created to mine gravel from the pit. At the time, Nick grossly exaggerated to Pettijohn the amount of gravel he had been excavating from the pit. Miami was formed as an LLC, with one member being N & N and the other being Central Indiana Sand & Gravel, LLC ("Central Indiana"), a company formed by Pettijohn and two of his relatives.

John and Georgia executed a twenty-year lease giving Miami the exclusive right to mine the gravel pit. The lease required Miami to pay royalties to John and Georgia for minerals sold from the premises at the rate of 20 cents per ton. The lease also provided that the weight of materials was to be measured by scales installed by Miami on the premises. Nick and Tonia were employees of Miami and ran day-to-day operations at the gravel pit.

The Miami business venture quickly deteriorated. From the outset, Miami's operations were being financed almost entirely by cash contributions from Central Indiana and Pettijohn's other businesses, with little or no contribution from N & N. Nick and Pettijohn also had disagreements about whether to focus on excavating and selling gravel or dirt. The Department of Natural Resources temporarily shut down Miami's operations because it lacked a mining permit. Immediately after obtaining the permit, the Mining Safety and Health Administration shut down operations because of safety violations. There were frequent disputes between Tonia, who handled "on-the-scene" paperwork related to the gravel pit's finances, and Susie Pettijohn, who did the same for Central Indiana and Miami, relating to Tonia's poor record keeping.

* * *

On July 27, John, Georgia, Pettijohn, Susie, and two attorneys met to discuss Miami and the overall mining operations. At that meeting, the parties discussed the difficulties Miami had had in installing operational scales at the gravel pit by which materials removed from the pit could be weighed and royalties owed to John and Georgia calculated on that basis, as provided by the mining lease. John and Georgia had been accepting royalty payments from Miami on a per-truckload and estimated weight basis and agreed to continue doing so until scales could be installed. John and Georgia also said that they wanted Miami to continue mining the pit without Nick's involvement. However, by July 31, John and Georgia indicated they had changed their minds and wanted Miami to cease operations and be held in breach of the lease for failing to install scales at the pit.

The antagonism among the parties continued. On August 7, 2001, Pettijohn and his brother went to the pit. The Pettijohns were working at the pit when Nick and an unidentified individual drove onto the property behind some weeds, fired a gunshot, then left the property. Later, after the scales had been installed at the pit, UPS delivered weigh tickets for the scales to John and Georgia's house instead of to the pit

office 200 yards away. Tonia was there at the time and advised Georgia to return the tickets to UPS and have them re-sent to the pit, rather than simply walking them to the pit herself.

On August 10, 2001, Miami filed a multi-count complaint against N & N, Nick, Tonia, John, and Georgia. It alleged inter alia that the parties were jointly and severally liable to Miami for conversion and trespass. It also sought to enjoin the parties from interfering with Miami's operation of the gravel pit. In their answer filed separately from Nick and Tonia, John and Georgia denied any wrongdoing. They also filed a cross-complaint, alleging that Miami was in breach of the mining lease. Nick and Tonia raised several cross-claims of their own alleging fraud and conversion by Pettijohn and Miami, and seeking dissolution of Miami and a restoration of assets to N & N.

*Nance v. Miami Sand & Gravel, LLC*, 825 N.E.2d 826, 831–33 (Ind.Ct.App.2005), *trans. denied* (*Nance I* ). The trial court found John, Georgia, Nick, and Tonia[2] jointly and severally liable for conversion and trespass, awarding damages of approximately $60,000 and costs and attorney fees of approximately $77,000. It also found that all four of the Nances were in contempt of court and imposed a $20,000 fine, for which they were jointly and severally liable. Finally, it entered a permanent injunction preventing John and Georgia from, among other things, doing any act "asserting title to or right to possession of the leasehold property" during the lease's period, which the trial court extended by two years. *Id.* at 833. John and Georgia appealed.

On appeal, we concluded that there was insufficient evidence supporting a conclusion that John and Georgia were jointly and severally liable for conversion and trespass, and reversed the judgment against them in full except for interest that had accrued on $524 that they had temporarily withheld from—but ultimately returned to—Miami. We also found that there was no evidence establishing that any alleged contemptuous behavior on the part of John and Georgia caused actual damage to Miami and reversed the $20,000 contempt fine. Additionally, we reduced the award of costs to Miami to $104. Finally, we found that the permanent injunction was overly broad and remanded the case to the trial court with instructions to rewrite certain provisions of the injunction.

Between the spring of 2003 and May 14, 2005, Miami ceased all mining operations on the leased premises. The Nances provided affidavits from two individuals whose residences are adjacent to the leased premises, and who attested that they had observed no activity on the leased premises during that period of time.

On January 5, 2005, the Nances filed a verified petition for declaratory judgment and complaint to terminate lease against Miami in the Boone Circuit Court. Among other things, the Nances contend that as the result of a provision in the lease, Miami's cessation of activity between spring of 2003 and May 2005 enables the Nances to terminate the lease. Miami filed a motion to transfer and consolidate with *Nance I*, which was still pending on remand in Madison County at the time the Nances filed the instant petition and complaint. It also filed a motion to dismiss pursuant to Indiana Trial Rules 12(B)(1) and 12(B)(8). The trial court denied Miami's motions and proceeded to consider the Nances' petition and complaint. Miami raised the following substantive arguments and affirmative defenses: (1) the trial court should have

---

2. Nick and Tonia are the son and daughter-in-law, respectively, of John and Georgia.

dismissed the Nances' petition and complaint because of the pending matter in *Nance I;* (2) Miami's cessation of mining activity does not trigger lease termination because it was the result of force majeure stemming from the Nances' refusal to remove certain equipment from the leased premises and because Miami's employees were afraid to come to the pit because they worried they would be caught in gunfire.

On June 6, 2005, the Nances filed a motion for summary judgment and a designation of evidentiary materials. Miami responded by filing Pettijohn's affidavit with the clerk of the court. Neither party filed memoranda in support of their respective positions. The Nances filed a motion to strike Pettijohn's affidavit because it was not based on personal knowledge and contained improper conclusory statements. Although the trial court never specifically ruled on this motion, it later indicated its reluctance to grant summary judgment based upon a "procedural violation...." Tr. p. 21. Following a hearing, the trial court granted the Nances' motion for summary judgment on October 28, 2005, concluding, in pertinent part, as follows:

> 7. Therefore, the evidence designated in this matter is undisputed that the Respondent failed to perform mining, processing or marketing operation on the Leased Premises for a period of more than 180 consecutive days, that the Respondent failed to cure this default within 60 days after Petitioners provided written notice of the default and that Respondent's failure to perform under

the Mining Lease was not prevented by any circumstances or conditions beyond its control.

> Because the designated evidentiary matter shows that there is no material issue as to any material fact regarding Respondent's breach of the Mining Lease, the Respondent's rights under the Mining Lease are hereby terminated.

Appellant's App. p. 5. Miami now appeals.

## DISCUSSION AND DECISION

Miami argues that the trial court herein should have dismissed the Nances' complaint and petition because *Nance I* was pending in Madison County at the time the Nances filed the instant petition and complaint. Moreover, Miami contends that the trial court erred in finding that its cessation of mining operations was not the result of force majeure.

### I. Motion to Dismiss

■■■ Miami contends that the trial court erred in denying its motion to dismiss the Nances' petition and complaint.[3] As we consider this argument, we observe that we apply a de novo standard of review to the grant or denial of a motion to dismiss because the same action is pending in another court, inasmuch as it is a question of law. *Ind. & Mich. Elec. Co. v. Terre Haute Indus., Inc.,* 467 N.E.2d 37, 42 n. 2 (Ind.Ct.App.1984).

Indiana Trial Rule 12(B)(8) provides that a party may file a motion to dismiss a complaint because "[t]he same action [is] pending in another state court of this

---

**3.** Miami has not raised an argument with respect to the injunction issued in the Madison County case. But we note that while, as originally drafted, the injunction prevented John and Georgia from doing any act "asserting title to or right to possession of the leasehold property" during the lease's period, *Nance I,* 825 N.E.2d at 833, we ordered that

the trial court rewrite that provision so that "John and Georgia are permitted to exercise their rights to the property as provided by the mining lease." *Id.* at 840. Thus, as revised, the Madison County injunction did not prevent John and Georgia from filing the instant action, which is based upon the lease itself.

state." We have described the way in which a 12(B)(8) motion to dismiss should be evaluated as follows:

A general principle of Indiana law is that when an action is pending before one Indiana court, other Indiana courts must defer to that court's authority over the case.... The determination of whether two actions being tried in different state courts constitute the same action depends on whether the outcome of one action will affect the adjudication of the other. The rule applies and an action should be dismissed where the parties, subject matter, and remedies are precisely or even substantially the same in both suits. Thus, when faced with a challenge to a trial court's dismissal on the basis of T.R. 12(B)(8), the critical question before us is "whether the parties, subject matter, and remedies are either precisely or substantially the same."

*Vannatta v. Chandler*, 810 N.E.2d 1108, 1110–11 (Ind.Ct.App.2004) (quoting *Davidson v. Perron*, 716 N.E.2d 29, 36 (Ind.Ct. App.1999)) (citations omitted).

Miami asks us to focus on whether the outcome of the instant action will affect the adjudication of the action in Madison County, inasmuch as a determination herein that the lease is terminated would likely require the dissolution of the permanent injunction put in place in that lawsuit. While we acknowledge that the effect of the outcome in one action upon the other is, in fact, part of the language regularly used to explain Rule 12(B)(8) analysis, our research has revealed no reported cases on this issue that turned on interconnected outcomes. Instead, the cases focus on whether the parties, subject matter, and

remedies are precisely or substantially the same. *See, e.g., id.; Davidson*, 716 N.E.2d at 35–36. We will focus our analysis, therefore, on the respective parties, subject matter, and remedies in the instant case and the Madison County case.

All of the parties involved in this case were also involved in the Madison County case, although the Nances' son and daughter-in-law—Nick and Tonia—were also involved in that case. *Nance I*, 825 N.E.2d at 833. Turning to subject matter, as described above, the Madison County case concerned certain events that took place in 2001, including Nick and Tonia's questionable conduct with respect to Miami. Among other things, Nick and Tonia diverted thousands of dollars to their own bank account rather than forwarding the funds to Miami as required. *Id.* at 832. After Pettijohn fired Nick from his employment with Miami, Nick and another individual drove onto the leased premises while Pettijohn and his brother were working thereon, fired a gunshot, and left. Thereafter, Miami filed a complaint against Nick, Tonia, and the Nances for conversion and trespass, also seeking to enjoin the four family members from interfering with mining operations. The Nances filed a cross-complaint against Miami, alleging that Miami was in breach of the lease because of Miami's difficulties in installing operational scales at the gravel pit. The remedies sought by Miami in *Nance I* were damages, costs, and an injunction. The remedy sought by the Nances in their cross-claim was termination of the lease.[4]

▮ Turning to the case at hand, the Nances' petition and complaint stem from Miami's alleged cessation of mining opera-

---

4. Because neither Miami's complaint nor the Nances' cross-complaint in the Madison County case are included in the record on appeal, we rely on the facts provided in the *Nance I* opinion in our analysis of the similarities and differences between that case and the Boone County case.

tions between 2003 and 2005. As to remedies, the Nances are seeking termination of the lease and costs. It is apparent that regardless of overlap between parties and remedies, the subject matter of the Madison County case is entirely independent of and different from that of the Boone County case. Under these circumstances, the trial court properly concluded that the action filed in this case was not the same action pending in Madison County. Consequently, the trial court properly denied Miami's motion to dismiss.[5]

### II. Force Majeure Clause

Miami next argues that the trial court erred in interpreting the lease. Specifically, it contends that there is a genuine issue of material fact with respect to whether its cessation of mining operations was permissible pursuant to the lease's force majeure clause.

As we consider this argument, we observe that summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any

doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

In this case, the lease describes its term as follows:

> This lease shall be for a term of twenty (20) years from the date hereof (called the "Primary Term") and as long thereafter *provided that mining, processing or marketing operations pertaining to the Leased Substances, or any one or more of them, are being performed hereunder,* and/or as long thereafter as this lease may be maintained in force and effect under any of the provisions herein contained.

> For purposes of this lease, *mining, processing or marketing operations, or any one of them, are "being performed" so long as all such operations do not cease for a period of more than one hundred eighty (180) consecutive days, excluding periods of "force majeure"* as provided herein. The term "mining operations" as used in this lease shall mean the mining of Leased Substances,

---

**5.** In its statement of issues and argument heading, Miami implies that it will also argue that the trial court should have granted its motion to dismiss based on Trial Rule 12(B)(1) and lack of subject matter jurisdiction. Additionally, Miami quotes Trial Rule 21(B) and seems to imply that the case should have been transferred to Madison County pursuant to that rule. But Miami fails to present any argument on these issues or to cite to legal authority to support its position. Because failure to present a cognizable argument waives an issue for appellate review, we will not address either argument. *See, e.g., Topp v. Leffers,* 838 N.E.2d 1027, 1029 n. 1 (Ind.Ct.App.2006), *trans. denied.*

or any one or more of them, from the Leased Premises; operations for opening, re-working, deepening, extending or repairing a gravel pit, quarry, or mine; all other operations conducted in an effort to obtain or reestablish the production of Leased Substances, or any one or more of them; and, the performance by Lessee of any other operations permitted hereunder.

Appellant's App. p. 72–73 (emphases added). The lease's force majeure clause reads as follows:

The failure to perform or to comply with any of the covenants or conditions hereof on the part of the Lessee shall not be a ground for cancellation or termination or forfeiture hereof, during such time as such failure to perform is caused, or compliance is prevented, by severe weather, explosion, unusual mining casualty, mill or plant shutdown, damage to or destruction of mill or plant facility, fire, flood, civil or military authority, insurrection, riots, strikes, inability after diligent effort to obtain competent workmen or material, acts of God or any circumstances or conditions beyond the control of Lessee, and Lessee shall be excused from, and not held liable for such failure to perform or to comply, and any such time as the Lessee is so prevented from operating shall be added to the current term of the lease.

*Id.* at 78.

Miami begins by arguing that the Pettijohn affidavit complied with all applicable rules and that it properly designated evidence in support of its opposition to the Nances' motion for summary judgment. This argument is curious, inasmuch as the trial court, in response to the Nances' mo-

tion to strike Pettijohn's affidavit and argument regarding Miami's designation of evidence, made clear that it was not going to base its summary judgment ruling on "a procedural violation...." Tr. p. 21. After making that statement, the trial court and the Nances' attorney agreed to move on to the substance of the case. *Id.* Consequently, nothing in the record indicates that the trial court refused to consider the Pettijohn affidavit or any other evidence designated by Miami in support of its opposition to the Nances' motion for summary judgment.

Miami next argues that the trial court erred in its interpretation of the lease provision providing that "mining, processing, or marketing operations, or any one of them," must not cease for a period of 180 days. Appellant's App. p. 73. Specifically, Miami complains that although the trial court focused only on the activity, or lack thereof, that was taking place on the leased premises, the lease provision is broader than that in that so long as any mining, processing, or marketing operations are taking place, there is no violation of this clause.

We agree with Miami's interpretation of this clause. But unfortunately for Miami, it has provided no evidence that it was, in fact, conducting any processing or marketing operations during the period of time in question.[6] Miami directs our attention to a single paragraph in the Pettijohn affidavit as the sole support for this argument:

29. MIAMI has not ceased for a period of more than one hundred eighty (180) consecutive days, excluding periods of

---

6. Miami concedes that it conducted no mining operations on site during this time, inasmuch as it argues that it was unable to do so because of the Nances' failure to remove

equipment and refusal to assure Miami that they would comply with the *Nance I* permanent injunction.

"force majeure" as provided in the Mining Lease the

mining of Leased Substances, or any one or more of them, from the Leased Premises; operations for opening, reworking, deepening, extending or repairing a gravel pit, quarry, or mine; all other operations conducted in an effort to obtain or reestablish the production of Leased Substances, or any one or more of them; and, the performance by Lessee of any other operations permitted hereunder.

Mining Lease, ¶¶ 2.0 and 3.0.

Appellant's App. p. 217.

Miami offers no specific details about any alleged operations it was performing during the period of time in question. Indeed, it offers no details at all, nor does the Pettijohn affidavit elaborate upon this conclusory statement, which consists primarily of a quotation from the lease. As noted by Miami in its reply brief, a lack of detail in an affidavit goes to the weight and credibility of the affidavit. *Scott v. City of Seymour,* 659 N.E.2d 585, 592–93 (Ind.Ct.App.1995). It is apparent to us that this conclusory statement in the Pettijohn affidavit is insufficient to create a genuine issue of material fact with respect to whether Miami ceased operations for 180 days in violation of the lease.

▮ Miami next contends that even if it did cease all operations, its cessation was permissible because it fell within the lease's force majeure clause. First, Miami argues that the Nances' failure to remove certain equipment from the leased premises—as they were required to do by the *Nance I* permanent injunction—prevented Miami from performing any mining operations. Second, Miami points to its request that the Nances provide assurance that they would obey the *Nance I* permanent injunction by staying away from the premises. Essentially, Miami contends that its

employees feared for their lives following the gunshot in 2001, and it argues that it was "afraid for the lives of [its] employees" if it sent them onto the property to work. Reply Br. p. 11. Finally, Miami argues that the stay of proceedings in effect in Madison County while the case was pending appeal prohibited it from "enforcing its rights to re-enter and establish mining activities at the pit. . . ." Appellant's Br. p. 25.

As to the Nances' failure to remove certain equipment from the leased premises, nothing in Pettijohn's affidavit explains why the equipment prevented Miami from continuing with mining operations. Indeed, the only paragraphs in the affidavit to address this issue read as follows:

27. The equipment John Nance has thus far failed to remove [from] the gravel pit as ordered by Judge Carroll prevents MIAMI from concluding purchases of new equipment, about which Affiant has had many discussions with sellers of such equipment, mining, processing or marketing operations pertaining to the Leased Substances.

28. John Nance's actions and failure to remove equipment . . . has made and continues to make it impossible for MIAMI to go about business as usual at the pit and to invest further sums of money to replace the excavating equipment.

Appellant's App. p. 217. Paragraph 27 makes little sense, so between these two paragraphs the only relevant assertion is that the Nances' failure to remove the equipment has made it impossible for Miami to continue with mining operations. As aptly put by the trial court,

How is the allegation that there's some property there and we didn't get, and it's not been removed, stop us from doing anything on the premises? That to

me I'm really struggling with. And it doesn't make any difference whether a court somewhere ordered it or not you can go back and find somebody in contempt of court.

Tr. p. 43. Indeed, Miami acknowledged that it had not filed an action in Madison County to enforce the injunction and find the Nances in contempt for their failure to remove the equipment. *Id.* p. 44.

On the other hand, the Nances offered an affidavit indicating that certain equipment had been removed from the site in 2003, and the only remaining equipment was the same inoperable equipment that was on site before and during the period Miami was mining the site. Appellant's App. p. 230–31. Thus, the only detailed evidence in the record tends to establish that Miami was able, in the past, to conduct its mining operations with this equipment sitting in the same location on the leased premises. Under these circumstances, we conclude that the Pettijohn affidavit, with its lack of specificity and detail, is insufficient to create a genuine issue of material fact with respect to the removal of the equipment. Thus, the trial court properly concluded that the Nances' failure to remove the equipment did not, as a matter of law, constitute force majeure.

█ In considering Miami's allegation regarding the Nances' refusal to provide assurances that they would obey the Madison County permanent injunction, we turn to an exchange between the trial court and counsel for Miami:

THE COURT: I don't understand demanding assurances. There is an order that says I am due this. There is an order that says Mr. and Mrs. Nance you are to do this. I mean, I'm not sure I follow. I can't do something because you're not assuring that you're going to follow the law. I really don't see that as relevant at all—

MR. SIPES: *I agree with you, Your Honor.*

THE COURT:—to this allegation. I mean, you're alleging that as a basis to fight the summary judgment we're not getting assurances. Well, why would that person—what obligation do they have to insure [sic] to your client? I mean, what obligation do I have to assure to my ex-wife that I'm going to pay a certain debt. I mean, there's a court order that says I must pay that debt. I mean, what else must I be required to do?

MR. SIPES: I guess if she's suing you because you didn't pay it.

THE COURT: But you just told me there's—

MR. SIPES: And she says well I'm going to bring you into court but you say well I'm going to pay it and you say will you give me some assurance.

THE COURT: But help me out. You just told me there's no action pending to enforce those orders that have been issued by the other court, unless I missed something.

MR. SIPES: No, it's been an ongoing process.

Tr. p. 45–46 (emphasis added).

█ It is apparent that the trial court was correct to conclude that there is no requirement under the law for a party to provide assurances to the opposing party that it will obey a court order or injunction. If the enjoined party violates the order or injunction, the opposing party may request enforcement of the order or injunction. Furthermore, notwithstanding Miami's ostensible concern for the lives of its employees, it is unable to point to a specific action of the Nances during the period of time in question that suggests that its employees' lives would have been in danger had they returned to work. As

pointed out by the trial court, the Pettijohn affidavit

> doesn't say I've been there twelve (12) times and twelve (12) times I've been locked out, I've been there twelve (12) times, you know, I've invested, you know, I took somebody out to price some new equipment, I'm trying to mine and people are throwing rocks at me.

Tr. p. 48–49. And in fact, as noted above, Miami had not filed an action in Madison County to enforce the injunction. Under these circumstances, the trial court properly concluded that the Nances' refusal to provide the requested assurances did not constitute force majeure.

■ Finally, Miami contends that a stay of execution put in place by the Madison County court while the case was pending on appeal prevented it from reentering the leased premises and continuing mining operations. The order provides that "[t]he Trial Court will stay proceedings pending appeal, including any writ of execution, upon the giving of a bond or an irrevocable letter of credit ..." Appellant's App. p. 128. Initially, we note that the stay was not part of the record before the trial court when it was considering the Nances' motion for summary judgment. Indeed, counsel for Miami admitted that the trial court could not properly consider the stay because the trial court did not, in fact, have the document to examine. Tr. p. 50.

Even if we consider the stay, however, it provides no help to Miami. That the trial court ordered a "stay of proceedings" in no way affected Miami's ability to continue mining operations, inasmuch as neither the Nances' cross-complaint nor the trial court's final judgment required Miami to vacate the premises. Moreover, although Miami stopped mining in spring 2003, that timeframe in no way aligns with any relevant occurrences in the Madison County case. The complaint and cross-complaint were filed in August 2001, the trial court entered final judgment in December 2003, and the stay was put in place in March 2004. Consequently, the record reveals that Miami continued its mining operations after the litigation was initiated, but ceased those operations approximately nine months before final judgment was entered and one year before the stay was entered. Under these circumstances, it is apparent that the stay in no way affected Miami's decision to cease mining operations on the leased premises. The trial court, therefore, properly concluded that the stay did not constitute force majeure.

The judgment of the trial court is affirmed.

SULLIVAN, J., and MAY, J., concur.