

**FILED**

Sep 03 2015, 8:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Andrea L. Ciobanu
Alex Beeman
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Edward F. Schrager
Joshua T. Robertson
Cohen Garelick & Glazier
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Memory Gardens Management Corporation, Inc., | September 3, 2015 |
| *Appellant-Plaintiff*, | Court of Appeals Case No. 49A02-1501-CC-1 |
| v. | Appeal from the Marion Superior Court |
| Liberty Equity Partners, LLC, and Old Bridge Funeral Home, LLC, | The Honorable Heather A. Welch, Judge |
| *Appellees-Defendants*. | Trial Court Cause No. 49D12-1312-CC-45476 |

**Brown, Judge.**

[1] Memory Gardens Management Corporation, Inc. ("MGMC") appeals the trial court's order granting summary judgment in favor of Liberty Equity Partners, LLC, and Old Bridge Funeral Home, LLC (collectively, the "Old Bridge Parties"). MGMC raises one issue which we revise and restate as whether the trial court erred in granting summary judgment. Additionally, the Old Bridge Parties request appellate attorneys' fees. We affirm and remand.

## Facts and Procedural History

[2] Ansure Mortuaries of Indiana, LLC ("Ansure") owned several subsidiary companies owning and operating funeral homes, cemeteries, and other businesses in the funeral home and cemetery industry. MGMC was one of these wholly-owned subsidiaries but, unlike Ansure's other subsidiaries, was a management company whose primary function was to provide centralized managerial and administrative services to Ansure and its subsidiaries. Until January 2008, Robert Nelms was the Managing Member and CEO of the Old Bridge Parties, as well as the sole shareholder of Ansure and MGMC.

[3] On January 3, 2008, certain holders of a mortgage and other debt instruments executed by Ansure filed a Motion For Appointment Of Receiver Over Mortgagor Companies (the "Receivership Action") in the Johnson Circuit Court (the "Receivership Court") seeking the appointment of a receiver on the grounds that: (1) a receiver was necessary to protect their mortgage interest; (2) property, rents, and profits were in danger of being lost, removed, or materially injured; and (3) Ansure was in imminent danger of insolvency. Nelms, Ansure, and MGMC, among other subsidiaries of Ansure, were named as defendants in

the Receivership Action. On January 17, 2008, the State of Indiana filed a separate complaint seeking injunctive relief, declaratory relief, restitution, and appointment of a receiver in order to prevent continuing securities violations and misappropriations of trust fund monies by the defendants in the Receivership Action,[1] and the Receivership Court entered a Temporary Restraining Order "in order to maintain the status quo between the Parties and to allow the Parties to conduct discovery and prepare for the preliminary injunction hearing." Appellant's Appendix at 51.

[4] On January 22, 2008, by agreement of the parties in the Receivership Action, Lynette Gray (the "Receiver") was appointed as Temporary Receiver by the Receivership Court. On January 25, 2008, the Receivership Court entered an Order Extending Restraining Order and Appointment of Receiver, which provided that the Receiver was to oversee and control Ansure and its subsidiaries, including MGMC. On May 2, 2008, the Receivership Court issued its Findings of Fact, Conclusions Thereon, Preliminary Injunction, and Order of Continuing Receivership (the "Receivership Order"), which made the receivership over Ansure and its subsidiaries, including MGMC, permanent. In the Receivership Order, the Receiver was granted all of the rights and powers available to her under Indiana law. Additionally, the Receivership Order provided:

---

[1] On August 3, 2009, Nelms entered into a plea agreement in which he pled guilty to theft and securities fraud arising from his conduct relating to the funeral home, cemetery, and perpetual care requirements.

262.    The receiver shall, specifically:

A. Take control of [Ansure], including all wholly owned subsidiaries;

B. Marshall and account for all assets of the business entities;

C. Marshall and account for all trust fund assets of the business entities;

D. Assume the management of the day-to-day operations the [sic] business entities; and,

E. Manage the business operations of each entity in the best interests of the creditors and owner(s) thereof.

* * * * *

267.    [Ansure], its owner(s), directors, employees, agents, and the Defendants herein, shall fully cooperate with the Receiver or any of her employees or agents, including, but not limited to:

A. Replying promptly as requested to any inquiry from the Receiver, her employees, or agents;

B. Making available all books, records, accounts, documents, information, and property;

C. Abstaining from obstructing, interfering, frustrating, and / or interrupting the Receiver, her employees, or agents, in the conduct of her duties.

268.    Pursuant to Indiana Trial Rule 66(B), the Board of Directors of [Ansure] shall direct its employees to file with this Court, within thirty (30) days of this Order, a full, complete, itemized statement, in affidavit form, setting forth in detail all the assets and all the liabilities of [Ansure], including those assets and liabilities of the wholly owned subsidiaries, along with the names and addresses of all known creditors.

* * * * *

271. Robert Nelms and [Ansure] and their respective owners, directors, agents, employees, and / or assignees are hereby **PRELIMINARILY ENJOINED** from:

* * * * *

C. Altering, disposing, destroying, erasing, or secreting away any and all records . . . pertaining to the operating, management, or control of [Ansure] or any of its wholly-owned subsidiaries and the trust funds associated therewith;

* * * * *

F. Obstructing, interfering with, frustrating, and / or interrupting the Receiver, her employees, or agents, in the conduct of her duties; and

G. Conducting business or directing business decisions for or on behalf of [Ansure] or any of its wholly-owned subsidiaries.

*Id.* at 70-72.

[5] On June 2, 2008, MGMC's Controller filed an affidavit with the Receivership Court which purported to itemize the assets of Ansure and each of its wholly-owned subsidiaries. The itemization of MGMC's assets identified items such as office equipment, including tables, chairs, microwaves, and computer monitors, construction equipment, and automotive equipment. The Controller's affidavit did not identify any loans made by MGMC to the Old Bridge Parties. In an affidavit submitted to the Receiver, David Hernandez, a funeral director at the Old Bridge Funeral Home, stated that "during the construction of the Old Bridge Funeral Home, approximately $450,000.00 was

lent by Memory Gardens to Old Bridge Funeral Home, LLC to complete the construction." *Id.* at 460.

[6] On May 18, 2009, the Receiver filed her First Annual Report, which reported that she concentrated her efforts on the management of MGMC because it oversaw the business operations of all the entities controlled by Ansure. In her report, the Receiver confirmed that she had received MGMC's Controller's affidavit itemizing Ansure's assets. In addition, the Receiver reported that she interacted daily with members of MGMC's management team, including the acting CEO and Controller, the Trust and Compliance Officer, the Vice President of Sales and Marketing, and Ansure's Board Members. The Receiver also reported that she exchanged information with Nelms and his attorneys regularly. Neither Nelms, Ansure, nor MGMC objected to the Receiver's First Annual Report or the contents of the affidavit detailing Ansure's assets and creditors included with the report.

[7] On September 15, 2009, the Receivership Court made findings that the liabilities of the Ansure entities exceeded its assets, that Ansure and its subsidiaries were not able to pay their debts as they became due, and, as a result, Ansure and its subsidiaries were either insolvent or in imminent danger of becoming insolvent. The Receivership Court ordered Nelms or Ansure to propose a definitive plan by October 16, 2009, providing for the restoration of liquid assets into the cemetery trust of the Ansure entities. The Receivership Court provided that in the absence of such a plan the court would likely

authorize the Receiver to begin liquidating the Ansure entities, including MGMC.

[8] On January 12, 2010, the Receivership Court granted the Receiver approval to seek a purchaser of Ansure and its subsidiaries. On January 28, 2010, the Indiana Securities Commissioner, who was a party to the Receivership Action, filed a Motion to Revoke Receivership following the closing of a proposed sale of Ansure and its assets to a company named StoneMor pursuant to the terms of an Asset Purchase Agreement negotiated and executed among the Securities Commissioner, Nelms, and StoneMor on January 11, 2010. On February 2, 2010, the Receiver filed an objection to the Securities Commissioner's Motion to Revoke Receivership on the grounds that the Receiver was excluded from the negotiations, that Nelms had no authority to execute the Asset Purchase Agreement on behalf of Ansure, and that the terms of the agreement were not in the best interest of creditors. On April 2, 2010, having negotiatied an Amended and Restated Asset Purchase Agreement (the "APA") with StoneMor, the Receiver sought court approval of the APA, which the court granted on April 29, 2010. Under the APA, StoneMor did not acquire an equity interest in MGMC.

[9] On July 6, 2010, the Receiver filed a Motion for Order to: 1) Terminate Receiver's Control Over Certain Entities, 2) Turn Over Assets, and 3) File Final Report (the "Turnover Motion"). With the APA having been consummated on June 22, 2010, resulting in the vast majority of Ansure's assets being sold to StoneMor, the Receiver sought permission from the Receivership Court to

return certain assets to Nelms and to retain control over MGMC for the purpose of closing out its accounts and winding down its business affairs. The Turnover Motion provided that the sale of Ansure's assets resolved the primary reason for the Receivership and eliminated the need for a corporate office and "the continuation of [MGMC], whose complex affairs must be wound down at a significant cost." *Id.* at 104. Neither Nelms, Ansure, nor MGMC objected to the Turnover Motion.

[10] On July 26, 2010, the Receivership Court approved the Turnover Motion, providing in part:

> **IT IS THEREFORE ORDERED THAT t**he Receiver shall retain control over MGMC, its operating accounts, and the Receiver's Closeout Account until further order of this Court.
>
> . . . the Receiver's Final Report [] shall be filed no later than September 27, 2010.
>
> * * * * *
>
> . . . any objections and / or exceptions to the Receiver's Final Report may be filed no later than October 28, 2010.
>
> . . . pursuant to Indiana Code 32-30-5-18, any claims or exceptions not filed on or before October 28, 2010 are forever barred for all purposes.

*Id.* at 901-902. No appeals were taken from the Receivership Court's Order Granting Turnover Motion.

[11] On October 29, 2010, the Receiver filed her Receiver's: (1) Final Report; (2) Final Accounting; (3) Motion to Determine That All Previous Interim Fees and Expenses Awarded to Receiver and Her Counsel are Final Allowances; (4)

Request For Release and Discharge of Bond (the "Final Report") in which she reported that the wind down of MGMC was begun immediately after the sale to StoneMor and had been essentially completed except to the extent necessary to maintain tax records. Neither Nelms, Ansure, nor MGMC objected to the Final Report. On December 27, 2010, the Receivership Court issued an Order Approving Final Report that specifically identified the assets to be returned to Nelms, and did not list MGMC among those assets. On April 6, 2011, the Receiver filed Articles of Dissolution for MGMC with the Indiana Secretary of State, which issued a Certificate of Dissolution certifying that MGMC's dissolution was effective as of April 6, 2011.

[12] On September 14, 2011, the Receiver filed a Supplemental Final Report. Nelms, Ansure, and MGMC did not object to the Supplemental Final Report, and it was approved by the Receivership Court on December 12, 2011. On April 25, 2013, the Receiver filed a Final Supplemental Report, which stated that the Receivership was no longer necessary and requested that the Receiver be discharged. The Receivership Court approved the Final Supplemental Report on April 30, 2013, and discharged the Receiver.

[13] On December 24, 2013, approximately two years and eight months after MGMC's dissolution, Nelms, purporting to act as President of MGMC, filed a Verified Complaint for Damages on Commercial Note, Security Agreement, and for Replevin (the "Complaint") in the present action. As alleged in the Complaint, on March 3, 2006, the Old Bridge Parties executed and delivered a Demand Note in favor of MGMC in the amount of $450,000 with an effective

date of March 1, 2005.[2] The Complaint also alleged that the Old Bridge Parties entered into a Security Agreement with MGMC on March 3, 2006 to secure repayment of the Demand Note,[3] and that the Old Bridge Parties breached the terms of the Demand Note and the Security Agreement (together, the "Demand Note") and are indebted to it in the amount of $450,000 plus interest.

[14] On March 24, 2014, the Old Bridge Parties filed a motion for summary judgment together with designated evidence and a memorandum in support of the motion. In their memorandum, the Old Bridge Parties argued that MGMC's claims under the Demand Note were forever barred by operation of law and that, having been dissolved, MGMC did not have standing to bring the claims. On August 22, 2014, MGMC filed its response in opposition to the Old Bridge Parties' motion for summary judgment and cross-motion for summary judgment. MGMC argued that its claims were not barred and that MGMC had standing to bring claims under the Demand Note despite having been dissolved during the Receivership. Specifically, MGMC claimed that it is attempting to be reinstated as an ongoing concern and that MGMC, along with the Demand Note, were returned to Nelms.

[15] On December 4, 2014, following a hearing on the matter held on June 27, 2014, the trial court entered an order granting the Old Bridge Parties' motion for

[2] Nelms signed the Demand Note on behalf of the Old Bridge Parties.

[3] Nelms signed the Security Agreement on behalf of MGMC and the Old Bridge Parties.

summary judgment and denying MGMC's cross-motion for summary judgment. In its order, the trial court stated:

> [T]he $450,000 Demand Note was an asset subject to the Receivership. As such, the Receiver was able to consider collecting the $450,000. By omitting any mention [of] the $450,000 Demand Note at issue in her Inventory or failing to collect the $450,000, the Receiver effectively abandoned this claim. Indiana Code § 32-30-5-18(b) placed an affirmative duty upon Ansure, MGMC, and/or Nelms to file their objections or exceptions to the Receiver's Inventory and Final Report/Accounting within the 30 day period. Since neither Ansure, MGMC, nor Nelms filed an objection, MGMC is forever barred from its claim as to the $450,000 Demand Note.
>
> Since MGMC is forever barred from bringing its claim as to the $450,000 Demand Note [the Old Bridge Parties] are entitled to summary judgment as a matter of law on MGMC's Complaint. . . .

*Id.* at 1079.

## *Discussion*

### I.

[16] The issue is whether the trial court erred in granting the Old Bridge Parties' motion for summary judgment. In Indiana, the procedure and standard by which appellate courts review challenges to a trial court's order granting or denying summary judgment is clear. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). "Our standard of review is the same as it is for the trial court." *Id.* (citing *Kroger Co. v. Plonski*, 930 N.E.2d 1, 4 (Ind. 2010)). "The moving party 'bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of

law.'" *Id.* (quoting *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012)). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the non-moving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party. *Id.* (citing *Plonski*, 930 N.E.2d at 5). An appellate court reviewing a challenged trial court summary judgment ruling is limited to the designated evidence before the trial court, *see* Ind. Trial Rule 56(H), but is constrained to neither the claims and arguments presented at trial nor the rationale of the trial court ruling. *Id.*

[17] The fact that the parties make cross-motions for summary judgment does not alter our standard of review. *Huntington v. Riggs*, 862 N.E.2d 1263, 1266 (Ind. Ct. App. 2007), *trans. denied.* Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

[18] Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk,* 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

[19] MGMC argues that Ind. Code § 32-30-5-18 (the "Non-Claim Statute") does not apply in the present situation because the Demand Note was not referenced in the Receiver's Final Report or any of the Receiver's accountings of Ansure's assets and "[o]ne is under no obligation to object or make exceptions to something that is not contained in the final report by the plain language of the statute." Appellant's Brief at 12. Additionally, MGMC asserts that the trial court erred when it determined that, by not referencing the Demand Note in her Final Report, the Receiver had abandoned all claims to it.

[20] Ind. Code § 32-30-5-7 outlines the receiver's powers and duties, providing:

> The receiver may, under control of the court or the judge:
>
> > (1) bring and defend actions;
> >
> > (2) take and keep possession of the property;
> >
> > (3) receive rents;
> >
> > (4) collect debts; and
> >
> > (5) sell property;
>
> in the receiver's own name, and generally do other acts respecting the property as the court or judge may authorize.

Also, the Non-Claim Statute provides as follows:

(a) During the thirty (30) day period referred to in section 17[4] of this chapter, any creditor, shareholder, or other interested party may file objections or exceptions in writing to the account or report.

(b) Any objections or exceptions to the matters and things contained in an account or report and to the receiver's acts reported in the report or account that are not filed within the thirty (30) day period referred to in section 17 of this chapter *are forever barred for all purposes.*

Ind. Code § 32-30-5-18 (emphasis added). Additionally, the finality of the receiver's report once it is accepted by the trial court is governed by Ind. Code § 32-30-5-21:

Upon the:

(1) court's approval of the receiver's final account or report, as provided in section 14 of this chapter; and

(2) receiver's performance and compliance with the court's order made on the final report;

the receiver and the surety on the receiver's bond shall be fully and finally discharged and the court shall declare the receivership estate finally settled and closed *subject to the right of appeal* of the receiver or any creditor, shareholder, *or other interested party who has filed objections or exceptions* as provided in section 18 of this chapter.

---

[4] Ind. Code 32-30-5-17 provides in part:

(a) [U]pon the filing of an account or report, the clerk of the court in which the receivership is pending shall give notice of the date on which the account or report is to be heard and determined by the court.

* * * * *

(c) The date in the notice on which the account or report is to be heard and determined by the court shall be fixed not less than thirty (30) days after the date of the filing of the account or report.

(emphases added).

[21] First, we address MGMC's argument that it had no obligation to object to the Receiver's treatment of the Demand Note. We have previously clarified that the Non-Claim Statute extends not only to the "matters and things contained in an account or report" but also to the matters and things omitted from an account or report that should have been included in the report. *Ratcliff v. Citizens Bank of W. Ind.*, 768 N.E.2d 964, 970 (Ind. Ct. App. 2002) ("Without timely exceptions or objections to the receiver's Final Report, [the Non-Claim Statute[5]] bars the Ratcliffs from now raising issues that should have been included in that report."), *trans. denied*; *see also Eryk-Midamco Co. v. Bank One, N.A.*, 841 N.E.2d 1190, 1195 (Ind. Ct. App. 2006) (holding that a bank's claims against a mortgagee stemming from a monetary transfer were barred by the Non-Claim Statute, and further noting that the bank "could—and should—have objected to the omission of any mention of the disputed funds in the receiver's final report"), *trans. denied*. In *Ratcliff*, one of the Ratcliffs' banks promised that it would provide financing for the expansion of the Ratcliffs' business. *Ratcliff*, 768 N.E.2d at 966. The Ratcliffs did expand their business, but the bank did not provide the promised financing. *Id.* As a result, the Ratcliffs could not pay their creditors, and a receiver was appointed over their assets. *Id.* While the receivership was pending, the Ratcliffs filed a complaint

---

[5] In *Ratcliff*, the court cited to Ind. Code § 34-48-4-5, which was repealed and recodified at Ind. Code § 32-30-5-18 by Pub. L. No. 2-2002, § 128 and § 15 respectively.

against the bank for not extending the promised financing. *Id.* Meanwhile, the receiver filed his final report. *Id.* The Ratcliffs did not object to the final report, and the court ordered the receivership closed. *Id.* Subsequently, the trial court presiding over the Ratcliffs' complaint against the bank dismissed the complaint, "concluding . . . that Indiana's non-claim statute forever barred their claims because they were assets subject to the receivership . . . ." *Id.* The Ratcliffs appealed the trial court's decision, and argued in part that their claim against the bank was not an asset subject to the receivership. *Id.* at 970. We concluded that "[t]he Ratcliffs' claims against the Bank . . . were assets subject to the receivership. And [the Non-Claim Statute] makes clear that they were required to file any objections or exceptions to the receiver's Final Report, which they failed to do." *Id.*

[22] We held in *Ratcliff* that, to determine whether the Non-Claim Statute applies, "[t]he question is . . . whether the [parties'] claims should have been administered in the receivership proceedings." *Id.* Thus, we must determine whether MGMC's claims under the Demand Note should have been administered in the receivership. The record reveals that the Receiver was ordered to take control of MGMC and its assets, and there is no question that the Demand Note was an asset of MGMC subject to this order. *See* Appellant's Appendix at 70 ("The receiver shall, specifically: . . . Marshall and account for all assets of the business entities; . . . ."). Additionally, the Receiver was vested with the power to collect all debts owed to Ansure and its subsidiaries, and the Demand Note constitutes a debt that was collectible by the Receiver. *See* Ind.

Code § 32-30-5-7(4). Because we determine that the Demand Note was an asset of MGMC and a debt owed to it, we find that all claims under the Demand Note should have been administered in the receivership proceedings. Further, because neither Nelms, Ansure, nor MGMC objected to the absence of the Demand Note in the Receiver's Final Report or the Receiver's failure to collect upon the Demand Note within the thirty day period provided by the Non-Claim Statute, we conclude that MGMC's claims under the Demand Note are forever barred for all purposes. *See* Ind. Code § 32-30-5-18(b); *see also Ratcliff*, 768 N.E.2d at 970; *Eryk-Midamco Co.*, 841 N.E.2d at 1195 ("Once the trial court in the foreclosure action approved the receiver's final report and Bank One did not object, any claim Bank One may have had to money that was collectible by the receiver was extinguished except in the context of an appeal in that action.").

[23] We next turn to MGMC's argument that the trial court erred in finding that the Receiver abandoned MGMC's claims under the Demand Note. As noted above, Ansure was required to file with the Receivership Court an affidavit "setting forth in detail all the assets and all the liabilities of [Ansure], including those assets and liabilities of the wholly owned subsidiaries." Appellant's Appendix at 71. As noted above, based upon this dictate it was incumbent upon MGMC to provide the Receiver with knowledge of the Demand Note's existence, and accordingly to the extent the Demand Note existed, the Receiver should have had knowledge of the Demand Note or a copy of it in her possession. As well, it is undisputed by the parties that the Receiver was vested

with the power to enforce and collect upon the Demand Note. *See* Ind. Code § 32-30-5-7(4). Similarly, the Receiver was also able to consider and abandon such an action. *See Eryk-Midamco Co.*, 841 N.E.2d at 1195 (holding that "[i]n omitting any mention of the funds at issue from his final report, the receiver effectively abandoned this claim" and noting that whether the receiver was specifically aware of the transfer "is of no moment, inasmuch as the receiver requested all records, information, and sums of money that were derived from the mortgaged premises") (citing Ind. Code § 32-30-5-18(b))), *trans. denied*. By omitting any mention of the Demand Note in her final report, we conclude that the Receiver effectively abandoned MGMC's claims under the Demand Note. *See id.*; Ind. Code § 32-30-5-7 (providing that a receiver has the power to "generally do other acts respecting the property as the court or judge may authorize").[6]

[24] We conclude that the court did not err in granting summary judgment in favor of the Old Bridge Parties.

## II.

[25] We turn next to the Old Bridge Parties' request for appellate attorneys' fees. Ind. Appellate Rule 66(E) provides in part that this court "may assess damages

---

[6] The Old Bridge Parties raise additional issues in their brief, including that the doctrine of judicial estoppel bars MGMC from enforcing the Demand Note, that MGMC lacks standing, and that the court correctly denied MGMC's cross-motion for summary judgment. Because we affirm the court's grant of summary judgment in favor of the Old Bridge Parties based on the foregoing reasons, we need not address these issues.

if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Our discretion to award attorneys' fees under Ind. Appellate Rule 66(E) is limited to instances when "an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003) (citing *Orr v. Turco Mfg. Co. Inc.*, 512 N.E.2d 151, 152 (Ind. 1987)). In addition, while Ind. Appellate Rule 66(E) provides this court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Id.* (citing *Tioga Pines Living Ctr., Inc. v. Ind. Family & Social Serv. Admin.*, 760 N.E.2d 1080, 1087 (Ind. Ct. App. 2001), *aff'd on reh'g*, *trans. denied*.). A strong showing is required to justify an award of appellate damages and the sanction is not imposed to punish mere lack of merit but something more egregious. *Harness v. Schmitt*, 924 N.E.2d 162, 168 (Ind. Ct. App. 2010).

[26] Indiana appellate courts have classified claims for appellate attorneys' fees into substantive and procedural bad faith claims. *Thacker,* 797 N.E.2d at 346 (citing *Boczar v. Meridian St. Found.*, 749 N.E.2d 87, 95 (Ind. Ct. App. 2001)). To prevail on a substantive bad faith claim, the party must show that "the appellant's contentions and arguments are utterly devoid of all plausibility." *Id.* Procedural bad faith, on the other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates relevant facts appearing in the record, or files

briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Id.* at 346-347. Even if the appellant's conduct falls short of that which is "deliberate or by design," procedural bad faith can still be found. *Id.* at 347.

[27] Here, we find that MGMC repeatedly omits, misstates, and misrepresents the relevant contents of the record as it relates to the return of MGMC and the Demand Note to Nelms at the conclusion of the Receivership Action, and we cannot characterize these omissions, misstatements, and misrepresentations as being within the bounds of acceptable advocacy. For instance, MGMC asserts that "the Receiver moved to terminate the receivership in nearly all aspects and return the remaining Ansure property, *including MGMC*, to Nelms . . . ," and cites to the Turnover Motion to support this assertion. Appellant's Brief at 9 (emphasis added). However, our review of the Turnover Motion reveals that the Receiver specifically identified eight entities to be returned to Nelms, which did not include MGMC. Indeed, the Turnover Motion provided that "[t]he Receiver will retain control over MGMC for the purpose of winding up its affairs," and requested that the Receivership Court "terminat[e] the Receiver's control over and return[] to Ansure its remaining assets – *except for MGMC . . . ."* Appellant's Appendix at 105-106 (emphasis added).

[28] Further, MGMC asserts that "the [Receivership Court] granted the Receiver's [Turnover Motion] and ordered the remaining Ansure property . . . , including MGMC, be returned to Nelms's designee." Appellant's Brief at 9. However,

the Receivership Court's order granting the Turnover Motion actually states the following:

> 4. . .
>
> * * * * *
>
> > D. Aside from continuing the operations of the remaining businesses owned by Ansure, the sale of most of Ansure's cemeteries and funeral homes eliminates the need for the existing corporate office and the continuation of the day to day operations of [MGMC];
> >
> > > i. MGMC's complex affairs must be wound down at a significant cost; and
> > >
> > > ii. The Receiver has implemented the wind down of MGMC and reasonably believes it can be substantially completed within 30-45 days from the filing date of the Receiver's Turnover Motion.
>
> 5. The Closeout Account negotiated in conjunction with the sale to StoneMor should have sufficient funds to wind up the affairs of MGMC and sufficient operating funds to allow the operating entities which were not sold to continue their respective businesses.
>
> 6. The Receiver has met with representatives of Nelms and Ansure's Board of Directors concerning restoring control of Ansure and its assets and affiliated entities to Nelms and Ansure's board.

7. The Receiver, Nelms, and Ansure have agreed that the following actions need to occur in order to wind up the Receivership as it relates to Ansure.

> *A. The Receiver should retain control over MGMC for the purpose of winding up its business and pay the windup costs from the operating accounts of MGMC or the Closeout Account;*

> B. The Receiver should return control over the following entities to Robert Nelms or his designee:

>> 1. Quality Marble,

>> 2. Memorial Planning Agency,

>> 3. Meyer Industries,

>> 4. Memory Gardens Logistics,

>> 5. American Bronze Craft, Inc.,

>> 6. Quality Printers,

>> 7. Mercury Development Services, Inc., and,

>> 8. Hamden Memorial Funeral Home.

* * * * *

8. The Receiver's Turnover Motion is therefore **GRANTED**.

**IT IS THEREFORE ORDERED THAT** the Receiver shall return control over Ansure and Quality Marble, Memorial

Planning Agency, Meyer Industries, Memory Gardens Logistics, American Bronze Craft, Inc., Quality Printers, Mercury Development Services, Inc., [and] Hamden Memorial Funeral Home to Robert Nelms or his designee.

**IT IS FURTHER ORDERED THAT** the Receiver is **RELEASED** from responsibility for any action, event, occurrence or liability of Ansure Mortuaries of Indiana, LLC, or its affiliates identified in paragraph 7(B) above, arising on or after the date of this Order, excepting Memory Gardens Management Corporation.

*IT IS FURTHER ORDERED THAT the Receiver shall retain control over MGMC, its operating accounts, and the Receiver's Closeout Account until further order of this Court. . . .*

Appellant's Appendix at 899-901 (emphases added). Thus, the Receivership Court was explicit in that it returned certain entities to Nelms but did not return MGMC to him, specifically ordering that MGMC "must be wound down" and "that the Receiver shall retain control over MGMC . . . until further order of this Court." *Id.* at 900-901.

[29] Additionally, MGMC cites to the Securities Commissioner's motion to revoke the receivership and the purchase agreement negotiated between the Commissioner and Nelms as further evidence of the return of MGMC to Nelms. However, MGMC fails to acknowledge that the Securities Commissioner's motion to revoke the receivership was never approved by the Receivership Court and was objected to by the Receiver and tacitly denied by the Receivership Court when it approved the Receiver's re-negotiated APA, which included no provision for the return of MGMC to Nelms. Based upon

MGMC's appellant's brief and our review of the record, we conclude that the Old Bridge Parties have demonstrated procedural bad faith on the part of MGMC. Moreover, we find that the totality of the violations discussed above transcends procedural bad faith and constitutes substantive bad faith. The misrepresentations of the record made by MGMC are at the heart of its claim on appeal, and after setting aside those misrepresentations, MGMC's arguments are left devoid of all plausibility. Accordingly, the Old Bridge Parties are entitled to appellate attorney fees, and we remand to the trial court to determine the proper amount of the appellate fee award.

## *Conclusion*

[30] For the foregoing reasons, we affirm the trial court's grant of the Old Bridge Parties' motion for summary judgment, affirm the trial court's denial of MGMC's cross-motion for summary judgment, grant the Old Bridge Parties' request for appellate attorney fees, and remand for a determination of the Old Bridge Parties' reasonable appellate attorney fees.

[31] Affirmed and remanded.

Riley, J., and Friedlander, Sr. J., concur.